UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

KENNETH ARCHBOLD,                          :

                         Petitioner,          :

         -against-                          :

J. HESSEL, Acting Superintendent,          :

                     Respondent.          :

--------------------------------------------------------x

| USDC SDNY |
| DOCUMENT |
| ELECTRONICALLY FILED |
| DOC #: _____ |
| DATE FILED:  6/20/11 |

**REPORT AND
RECOMMENDATION
TO THE HONORABLE
SIDNEY H. STEIN**[*]

08 Civ. 3898 (SHS) (FM)

**FRANK MAAS,** United States Magistrate Judge.

        Pro se petitioner Kenneth Archbold ("Archbold") brings this habeas

proceeding, pursuant to 28 U.S.C. § 2254, to challenge his convictions on charges of

Assault in the First Degree, Assault in the Second Degree, Aggravated Sexual Abuse in

the Second Degree, and Sexual Abuse in the First Degree (two counts), in Supreme

Court, New York County.  On April 19, 2005, Justice Bruce Allen, before whom the case

was tried, sentenced Archbold to an aggregate term of six years' imprisonment.  Archbold

was paroled in July 2010, but remains subject to post-release supervision until July 2015.

        In his habeas petition ("Petition" or "Pet."), Archbold argues that (a) he was

denied the effective assistance of counsel in violation of the Sixth and Fourteenth

Amendments, (b) he was deprived of due process of law under the Fourteenth

Amendment because the trial court admitted evidence of uncharged crimes, (c) his arrest

---

        [*]    This Report and Recommendation was prepared with the assistance of Greg
Mann, a student at the Benjamin Cardozo School of Law.

was not supported by the probable cause required by the Fourth and Fourteenth

Amendments, and (d) he was the victim of prosecutorial misconduct.

For the reasons set forth below, the Petition should be denied.  Additionally,

pursuant to 28 U.S.C. § 2253(c)(2), Archbold should be denied a certificate of

appealability because he has failed to make the necessary showing of the denial of a

constitutional right.

I.       Background

The criminal case against Archbold arose out of an incident on the morning

of August 10, 2003, during which he beat and sexually assaulted A.B., the mother of his

four children.[1]  A.B. initially kept the incident to herself, but later filed a petition in

Family Court on September 11, 2003, seeking an order of protection against Archbold.

(Resp't's Mem. at 2).  On November 21, 2003, when A.B. returned to Family Court for a

final order of protection, Archbold also appeared.  (Id. at 2-3).  At that point, after A.B.

told the police about the incident, Archbold was arrested.  (Id. at 3).

On June 15, 2004, a grand jury returned an indictment charging Archbold

with Rape in the First Degree, Aggravated Sexual Abuse in the Second Degree, Assault in

the Second Degree, and two counts each of Assault in the First Degree and Sexual Abuse

in the Second Degree.  (Id.).

---

[1]       I have referred to the victim by her initials to protect her identity.  See N.Y. Civil
Rights Law § 50-b.  For the same reason, I also granted the Respondent's motion to file the state
court records under seal.  (ECF No. 9.)

A.      Trial[2]

    1.      People's Case

    Viewed in the light most favorable to the prosecution, the People's evidence

would have permitted a reasonable juror to find as follows:

        a.      August 10 Incident

    In August 2003, A.B. lived in Manhattan with four children fathered by

Archbold.  (See Ex. B ("Resp't's App. Br.")).[3]  By then, A.B. and Archbold had shared a

thirteen-year on-and-off-again relationship, during which there were occasional violent

outbursts by Archbold against A.B. that she did not timely report.  (Id. at 6-10).  For at

least some of this time, Archbold lived in Virginia.  (See id. at 2, 7).

    On the morning of August 10, 2003, Archbold's level of violence against

A.B. escalated.  (Id. at 10-14).  That day, Archbold evidently was angry because A.B. had

permitted their youngest child to visit A.B.'s parents in Belize.  (Id. at 10).  Although

A.B. realized that Archbold was angry, she allowed him to enter her apartment.  (Id.).

_____

        [2]      Despite diligent efforts, the Respondent has not been able to locate a copy of the
trial transcript.  (See Decl. of Ass't Att'y Gen. Leilani Rodriguez, dated Oct. 1, 2008
("Rodriguez Decl."), ¶ 7); Resp't's Mem. at 3 n.2).  Accordingly, I have relied on the parties'
other submissions to the state courts and this Court as the basis for this summary of the trial
evidence.  See Douglas v. Portuondo, 232 F. Supp. 2d 106, 109 n.1 (S.D.N.Y. 2002) (noting that
Rule 5 of the Rules Governing § 2254 Cases permits the use of "a narrative summary of the
evidence" when a state court transcript "is neither available nor procurable"); Stevenson v.
Strack, No. 96 Civ. 8429 (DC), 1999 WL 294805, at *1 n.1 (S.D.N.Y. May 11, 1999) (same).

        [3]      "Ex. _" refers to the exhibits annexed to the Rodriguez Decl.

After admitting Archbold, A.B. walked away, but then turned to face him, at which point he grabbed her hair and kissed her roughly on the neck.  (Id.).  A.B. tried to push Archbold away, but he "grabbed her neck" and pushed her into the bedroom, where he fell on top of her on the bed.  (Id. at 11).  Archbold then kissed A.B. roughly on the neck, chest, and breasts.  (Id.).  While she was crying and begging Archbold to stop, A.B. also tried to get him off her, hitting him in the back and maneuvering in an effort to escape.  (Id.).

Kenneth III, the ten-year-old son of A.B. and Archbold, woke up because of the commotion.  (Id.).  When he entered the bedroom, he saw Archbold "on top of" A.B. (Id.).  Kenneth III believed that A.B. was trying to break free, and that Archbold was trying to hold her down.  (Id. at 11-12).  Archbold seemed angry and directed Kenneth III to leave the bedroom.  (Id. at 12).

As Archbold and A.B. continued to struggle, Archbold put his hands under A.B.'s dress, rubbed her leg, and "brush[ed] [her] panties to the side."  Archbold tried to penetrate A.B.'s vagina, but could not get his penis fully inside.  A.B. nonetheless felt the head of Archbold's penis enter her vagina "once or twice."  Thereafter, Archbold began to insert his fingers into A.B.'s vagina, starting with one finger, but increasing "to two, then three, then four" at once.  As Archbold moved his fingers back and forth inside A.B., her pain grew "more severe and more intense."  Archbold eventually got his "fist into [A.B.'s] vagina" before A.B. was able to break free of Archbold and fall onto the floor.  Archbold did not let up, however, and he proceeded to kick A.B. and hit her with both his

4

fists.  Archbold also struck A.B. in the face, causing her to bleed.  At this point, A.B. feared for her life.  (Id. at 12-13).

After Archbold went to the living room to "check on" the children, he allowed A.B. to wash up in the bathroom.  (Id. at 13).  A.B. then joined Archbold and the children in the living room.  (Id.).  Archbold told A.B. to return to the bedroom.  (Id.).  When A.B. apologized and told Archbold to leave, Archbold responded by grabbing A.B. around her neck with both his arms and dragged her to the bedroom.  (Id. at 13-14).  Not wanting to enter such a confined space, A.B. clutched the bedroom door until Archbold let her go into the children's bedroom instead.  (Id. at 14).

While in the children's bedroom, A.B. overheard Archbold telling the children that the situation was A.B.'s fault because she refused to allow the children to stay with him in Virginia.  A.B. then entered the living room to dispute Archbold's claim.  The two continued to argue until Archbold eventually left the apartment.  Before leaving, Archbold observed that if he went to jail, A.B. would have "put him there."  (Id.).

A.B. did not contact the police after Archbold left because she was reluctant to have the father of her children imprisoned.  (Id. at 15).  Nevertheless, A.B. and Kenneth III made several phone calls regarding the incident to family and friends.  (Id.).  A.B.'s cousin, Sherie Swift, arrived soon thereafter.  (Id.).  According to Swift, A.B. was sitting in the living room, holding a towel to her bruised and swollen face, and had blood gushing from her face and eyes.  (Id.).  A.B. told Swift that Archbold had choked her, raped her, and "put his fists inside of her."  (Id. at 16).

5

Archbold's brother and parents also arrived at the apartment in response to a call from A.B.  (Id. at 15-16).  After Archbold's mother was unable to stop A.B.'s bleeding, A.B. eventually agreed to go to Harlem Hospital.  (Id.).  Before she left for the hospital, A.B. spoke with both of Archbold's parents, who suggested that A.B. say that some girls had "jumped" her.  (Id. at 16).  At Archbold's mother's suggestion, A.B. also showered before leaving for the hospital.  (Id.).  As she showered, A.B. felt pain all over, and as though her vagina had been "ripped."  (Id.).

At the hospital, A.B. told emergency room personnel that "[so]me girls beat [her] up."  (Id. at 17).  A.B. was examined by Dr. James R. King, an expert in oral and maxillary facial surgery, and Dr. Afolabi Ogunleye, a second-year dental resident.  (Id. at 16-17).  A CAT scan of A.B.'s face established that she had a "blowout fracture of her left orbital floor" for which she underwent facial surgery under general anesthesia.  (Id. at 18-19).  A.B. also was prescribed pain medication and antibiotics.  (Id. at 18).

Following her surgery, near the end of a five-day hospital stay, A.B. asked Dr. Ogunleye about a gynecological consult.  (See id. at 19).  When Dr. Ogunleye questioned why A.B. needed to see a gyneologist, A.B. refused to provide any details unless her comments were "off the record."  (Id.).  After Dr. Ogunleye said he could not speak off the record, A.B. chose to wait until she could see her own gynecologist, despite her vaginal pain and bleeding that had continued for "[a] couple of days."  (Id. at 19-20).

During her time at the hospital, A.B. spoke with Police Officer Melisa Vaughn-Woodard, a domestic violence officer for the 32nd Precinct, while Archbold's

mother was present.  (Id. at 18-19).  Although A.B. was "reluctant" to talk because she did not want to get Archbold in trouble, Officer Vaughn-Woodard eventually learned that A.B. had been beaten by her children's father; however, the officer apparently did not discover the sexual nature of the assault.  (Id. at 19).

A.B. also spoke with Bonnie Glass, a counselor at Harlem Hospital.  (Id. at 20).  A.B. was more candid with Glass than with Officer Vaughn-Woodard and Dr. Ogunelye, stating that Archbold had sexually abused her.  (Id.).  However, A.B. still "wasn't ready" to go the police.  (Id.).

On the same day that she spoke to Glass, A.B. also called Police Officer Latisha Wilder, a close friend, whom she told about the sexual assault.  (Id. at 7, 21).  Officer Wilder contacted the 32nd Precinct and spoke with Officer Vaughn-Woodard, who indicated that a report had already been filed.  (Id. at 21).

On August 19, 2003, nine days after the incident, A.B. met with her own gynecologist, Dr. Carol McIntosh, who found no evidence of vaginal injury.  (Id. at 22).  Nevertheless, fewer than twenty or twenty-five percent of the rape and sexual assault victims that Dr. McIntosh treated had injuries that were detectable upon examination.  (Id.).

Following her hospitalization, A.B. continued to meet with Glass, who continually suggested that A.B. seek an order of protection against Archbold.  (Id. at 22).  When Glass eventually drafted a petition, A.B. asked her to omit the details of Archbold's

sexual abuse.  (Id.).  A.B. filed that petition in Family Court on September 11, 2003.
(Id.).

On November 21, 2003, A.B. appeared in Family Court with Glass to
secure a permanent order of protection.  (Id. at 22-23).  At around 10:30 a.m, Archbold
also appeared with his mother.  (Id. at 23).  Because A.B. was surprised to see Archbold
and feared for her safety, she called Officer Wilder, who arrived at Family Court with her
partner, Officer John Rivera.  (Id.).  There was some initial difficulty locating the
complaint that Officer Vaughn-Woodward had prepared, but, at Glass' urging, A.B.
spoke with a police officer from the 32nd Precinct.  Archbold subsequently was arrested.
(Id.).

> b.    Similar Acts

August 10, 2003, was not the first time that Archbold had attacked A.B.  In
the spring of 1993, when Archbold returned from his freshman year at college, the couple
became embroiled in an argument after A.B. uncovered other women's phone numbers
among Archbold's possessions.  (Id. at 5-6).  During this incident, Archbold "choked"
A.B., but she did not notify the police (or anyone else) because she considered this a
normal part of a relationship.  (Id. at 6).

In August 2000, while A.B., Archbold, and their children were in Florida on
a vacation, A.B. and Archbold had another physical altercation, during which Archbold
choked A.B. after she told him that she did not want their children to visit him in
Virginia.  (Id. at 7).  Again, A.B. did not notify the police.  (Id.).

In the winter of 2001, when A.B. reasserted her opposition to the children visiting Archbold in Virginia, Archbold "rushed at" A.B.  As a consequence, Archbold's sister, who was present, had to restrain Archbold.  (Id.).  Once again, A.B. did not report the incident.  (Id.).  By the time of this attack, A.B. was pregnant with Archbold's fourth child.  (Id.).  Archbold initially did not want A.B. to have the child and threatened to kill her unless she terminated the pregnancy.  (Id.).  After A.B. faced complications during childbirth, however, A.B. and Archbold grew closer.  (Id. at 8-9).  Their improved relationship persisted until July 2003, when Archbold received a cell phone call while in A.B.'s apartment that A.B. believed was from another woman.  (Id.).  When A.B. told Archbold to take the call outside in order not to "disrespect her," Archbold became enraged and pushed A.B. against the living room wall.  (Id. at 9).  A.B. ran into the bedroom where her children were sleeping, but Archbold pushed her again, causing her to fall and hit her head "pretty hard" on a toy chest.  (Id.).  A.B. had severe pain, but did not report the incident.  (Id.).

2.    Defense Case

At trial, Archbold presented a brief case, during which he called Police Officer Clyde Knight as a witness.  Officer Knight testified that he spoke with A.B. on the morning of November 21, 2003, for about ten to fifteen minutes, and then drafted the complaint upon which Archbold was arrested.  Although the complaint classified the crime as an assault, Officer Knight considered it an attempted rape.  (Id. at 23).

9

Archbold also called Andrea Mossiah, a cousin of A.B.'s, as a witness. Archbold had placed a telephone call to Mossiah, who was "like a mother figure" to A.B., after his arrest. During this call, Mossiah informed Archbold that A.B. had told her that social workers had threatened to take away A.B.'s children. Mossiah further testified, however, that, during this conversation, Archbold admitted that he had physically assaulted A.B., but denied having raped her. (Id. at 24).

B.     Verdict and Sentencing

On January 28, 2005, the jury found Archbold guilty of Assault in the First Degree, Assault in the Second Degree, two counts of Sexual Abuse in the First Degree, and Aggravated Sexual Abuse in the Second Degree. (Resp't's App. Br. at 4). The jury acquitted Archbold of one count of Assault in the First Degree (intentional disfigurement) and Rape in the First Degree. (Id.).

On April 19, 2005, Justice Allen sentenced Archbold to a determinate prison term of six years on the first degree assault count and concurrent indeterminate prison terms of one to three years on the other counts. (Id. at 2). On July 18, 2005, that sentence was amended nunc pro tunc to impose shorter determinate sentences on the counts other than Assault in the First Degree. (Id. at 2 n.1).[4]

---

[4]     Archbold's brief on direct appeal does not reflect this change in the sentences imposed. Archbold's actual sentence is, in any event, irrelevant since he does not contest its constitutionality.

10

C.    <u>Subsequent Procedural History</u>

1.    <u>Direct Appeal</u>

Archbold appealed his conviction to the Appellate Division, First Department, on several grounds.  First, Archbold claimed that the trial court improperly admitted irrelevant and prejudicial uncharged crimes evidence, prejudicial hearsay statements that A.B. made to medical personnel and others, and hearsay statements by A.B. that the court concluded fell within the "prompt outcry" exception.  (<u>See</u> Pet'r's App. Br., Points I-III).  Additionally, Archbold contended that the trial court improperly failed to set aside the jury's verdict as inconsistent.  (<u>Id.</u> Point IV).  Archbold further claimed that the verdict was against the weight of the evidence because A.B.'s testimony was not credible.  (<u>Id.</u> Point V).  Finally, Archbold maintained that his conviction should be set aside because the arresting officers lacked probable cause and because his trial counsel was ineffective.  (<u>Id.</u> Points VI-VII).

On May 17, 2007, the Appellate Division unanimously rejected these claims.  <u>See</u> <u>People v. Archbold</u>, 835 N.Y.S.2d 577 (1st Dep't 2007).  In its decision, the Appellate Division first concluded that the verdict was not against the weight of the evidence and found no reason to question the jury's credibility determinations.  <u>Id.</u> at 578.

Next, the Appellate Division held that, following a <u>Molineux</u> hearing, Justice Allen "properly exercised [his] discretion in permitting the introduction of

evidence of a series of uncharged crimes and bad acts[] committed against the victim."[5]
Id.  The court concluded in that regard that the "probative value of this evidence
outweighed its prejudicial effect."  Id.  The court further held that the evidence was
admissible to "prove the element of forcible compulsion, to explain the relationship
between defendant and the victim and to place the events into a believable context,
particularly because defendant raised the issue of the victim's delay in reporting the
charged criminal conduct, and to establish intent, motive, and identity."  Id. (internal
citations and quotation marks omitted).

Additionally, the Appellate Division held that Justice Allen properly
admitted A.B.'s statements to two physicians because each of those statements qualified
as a "prompt outcry" under the circumstances.  Id. at 579.

The Appellate Division also determined that Archbold had received
"effective assistance of counsel under the state and federal standards," noting that the
failure of Archbold's counsel to make certain objections did not "deprive [him] of a fair
trial or affect the result."  Id.

Finally, the court concluded that Archbold had failed to preserve his
remaining arguments — that certain other uncharged crimes evidence and hearsay

---

[5]      In People v. Molineux, 168 N.Y. 264, 293 (1901), the Court of Appeals adopted
what law students have come to know as the "MIMIC" exceptions to the proscription against the
prosecution's use of evidence of other crimes at trial.  See also Fed. R. Evid. 404(b) (evidence of
other "crimes, wrongs, or acts" is admissible in federal court to prove "motive, opportunity,
intent, preparation, plan, knowledge, identity, or absence of mistake or accident," provided the
defendant receives adequate advance notice of the general nature of the evidence the prosecution
proposes to use).

12

evidence was inadmissible, that the arresting officers lacked probable cause, and that the verdicts were repugnant.  The court declined to review these claims in the interests of justice, but nevertheless noted:  "Were we to review these claims, we would find them without merit."  Id.

By letter dated June 14, 2007, Archbold sought leave to appeal to the New York Court of Appeals on the grounds that (a) the verdict was against the weight of the evidence, (b) the evidence of uncharged crimes was improperly admitted, and (c) A.B.'s statements to the physicians and others were impermissible hearsay.  (See Ex. D).  Judge Robert S. Smith of the Court of Appeals denied Archbold's leave application on August 16, 2007, stating that there was "no question of law presented which ought to be reviewed."  (Ex. F).

2.    Motion to Vacate the Judgment

On August 28, 2006, Archbold filed a pro se motion to vacate his judgment of conviction pursuant to Section 440.10 of the New York Criminal Procedure Law ("CPL").  (Ex. G).  In that motion, Archbold contended that (a) he was deprived of the effective assistance of pre-trial and trial counsel,[6] (b) the trial court lacked personal jurisdiction over him, and (c) the prosecution and police procured the judgment of

---

[6]    Christina Garcia, Esq., of the Legal Aid Society, originally was appointed as counsel to Archbold.  After he posted cash bail, however, Archbold was required to retain counsel and retained Lawrence Spirn, Esq., to represent him.  (Ex. G at 4).  Mr. Spirn subsequently removed himself from the case with court approval because of his inability to communicate with Archbold.  (See Ex. H ¶¶ 5, 7).  Archbold then retained another attorney who defended him at trial.  (Id. ¶ 7).

conviction fraudulently because they knew that material evidence adduced at the trial was false.  (Id.).

Archbold alleged with respect to the first of these claims that Mr. Spirn, one of the attorneys who represented him prior to trial, improperly had (a) withdrawn his cross-grand jury notice at the request of the assistant district attorney without Archbold's knowledge or consent; (b) waived Archbold's right to a speedy trial without consulting him; (c) encouraged Archbold to participate in plea negotiations, despite his claims of innocence; and (d) caused him to attend a "queen for a day" meeting during which he revealed incriminating evidence.  (Id. (Aff. in Supp. of Mot.) at 1-8).

Archbold further alleged that his trial attorney, D. Andrew Marshall, Esq., provided ineffective assistance because he (a) failed to allege any specific facts in Archbold's omnibus motion, thereby causing the motion to be denied without any pre-trial hearings; (b) did not protect Archbold's right to testify before the grand jury or seek to have the indictment dismissed; and (c) consented to the jury being provided with copies of portions of the jury instructions during deliberations.  (Id. at 12-14).

Archbold alleged with respect to his jurisdictional claim that, because A.B. filed a Family Court petition several months before the Criminal Court complaint was filed, the Criminal Court lacked jurisdiction over him.  (Id. at 9-11).

Finally, Archbold contended that the criminal complaint leading to his arrest was inaccurate, and that the prosecutor knew it was based on false information.  (Id. at 15-21).

In reply papers dated May 23, 2007, Archbold elaborated upon his ineffective assistance and other claims, contending, among other things, that Mr. Marshall had failed to secure his presence for the trial court's <u>Sandoval</u> and <u>Molineux</u> hearings.[7] (Ex. I (Aff. & Mem. of L.) at 9-10).

Justice Allen denied Archbold's motion by order dated June 29, 2007. (<u>See</u> Ex. J). At the outset, the Justice found that several of Archbold's claims were barred by CPL § 440.10(2) because they previously were decided by the Appellate Division or could have been raised on direct appeal. (<u>Id.</u> at 1). According to Justice Allen, the claims that fell into this category were that (a) the court lacked jurisdiction, (b) Archbold was not present during the <u>Sandoval</u> and <u>Molineux</u> hearings, and (c) Mr. Marshall failed to file adequate motion papers or make critical objections at trial. (<u>Id.</u> at 1-2).

The Justice noted that even if these claims were not procedurally barred, they would fail on the merits. Turning first to Archbold's jurisdictional claim, Justice Allen held that the Criminal Court and Family Court had concurrent jurisdiction with respect to the charge of Assault in the Second Degree, and that the "Criminal Court had exclusive jurisdiction with respect to the other charges . . . since none of them were for crimes covered by the Family Court Act." (<u>Id.</u> at 1).

---

[7]    In <u>People v. Sandoval</u>, 34 N.Y.2d 371, 374 (1974), the New York Court of Appeals held that a trial judge may rule in advance of trial with respect to the prosecution's use of a defendant's prior convictions or misconduct to impeach the defendant's credibility.

Justice Allen further rejected Archbold's assignments of error arising out of the <u>Sandoval</u> and <u>Molineux</u> "hearings," noting that both proceedings took the form of oral argument, and that Archbold was, in fact, present when they occurred.  (<u>Id.</u> at 1-2).

The Justice also gave short shrift to Archbold's claim concerning the omnibus motion, observing that there was "no evidence . . . that would have been subject to suppression — no identification procedures, no statements to police, and no physical evidence seized from [him]."  (<u>Id.</u> at 2).  The Justice also rejected the claim that Mr. Marshall had failed to make adequate objections at trial on the ground that the Appellate Division had reviewed Archbold's contentions and found that the lack of objections did not amount to ineffective assistance.  (<u>Id.</u>).

Justice Allen also rejected the claims that he found were not barred from review.  In that regard, the Justice first held that withdrawing a grand jury cross-notice, requesting adjournments, and arranging to have the prosecutor interview Archbold pursuant to the "queen for a day" agreement did not constitute ineffective assistance or prejudice Archbold.  (<u>Id.</u> at 2).  As the Justice explained, these actions were consistent with Mr. Spirn's strategy of attempting to negotiate an "advantageous" plea, which was a reasonable strategy in light of the "overwhelming" case against Archbold, particularly with respect to the charge of Assault in the Second Degree.  (<u>Id.</u>).  As Justice Allen noted, Mr. Spirn's efforts did in fact lead to "a more favorable plea offer from the People" — albeit one that Archbold rejected.  (<u>Id.</u>).

16

Justice Allen further rejected the claim that Mr. Spirn had prejudiced Archbold's defense by not letting him attempt to talk his way out of the proposed charges by appearing before the grand jury.  Indeed, the Justice noted that "the failure to effectuate a defendant's desire to testify before the grand jury will not normally constitute ineffective assistance" under New York law.  (Id. at 3).  The Justice also found that Archbold had not "made any showing that a more favorable result would have been likely had he testified," or that he was prejudiced by any adjournments to which Mr. Spirn consented.  (Id. at 3).  As for Archbold's participation in the "queen for a day" session, Justice Allen noted that Archbold was not prejudiced since the People did not use any of Archbold's statements at trial.  (Id.).

Finally, Justice Allen denied Archbold's prosecutorial misconduct claim on the basis that any inconsistencies between the police reports and trial testimony fell "far short of establishing that the People . . . knowing[ly] use[d] . . . perjured testimony."[8] (Id.).

---

[8]    Justice Allen did not expressly address Archbold's additional claims that the Criminal Complaint against him contained inaccuracies of which the prosecutor was aware, and that Mr. Marshall was ineffective for failing to move to dismiss the indictment and permitting the jury to consult the jury instructions during deliberations.  Since Archbold does not raise the first of these claims in his Petition, the Court need not consider it.  Additionally, it is clear that his ineffectiveness claims are barred by CPL 440.10(2), as they could have been raised on direct appeal.

Archbold sought leave to appeal the denial of his Section 440.10 motion to the Appellate Division, which was denied on October 25, 2007. (Ex. M).[9]

### 3. Motion for Writ of Error *Coram Nobis*

On March 3, 2008, Archbold filed a pro se motion for a writ of error coram nobis. (Ex. P). In that motion, Archbold alleged that he was denied the effective assistance of counsel, in violation of the Sixth and Fourteenth Amendments, because his appellate attorney failed to argue (a) that Mr. Spirn was ineffective, (b) that the trial court erred in its response to a jury note about the "serious physical injury" element of both assault charges, (c) that Archbold was deprived of his right to be present at the Sandoval/Molineux "hearings," and (d) that, contrary to the People's contention, Archbold's Fourth Amendment claim was, in fact, preserved for appellate review. (See id.).

The Appellate Division summarily denied Archbold's motion for a writ of error coram nobis on July 1, 2008. (Ex. S). Archbold's subsequent request for leave to appeal to the Court of Appeals was denied on January 6, 2009. See People v. Archbold, 11 N.Y.3d 922 (2009).

### 4. Habeas Petition

In his Petition, Archbold claims that (a) he was denied the effective assistance of counsel in violation of the Sixth and Fourteenth Amendments, (b) he was deprived of due process of law under the Fourteenth Amendment because the trial court

---

[9]     Judge Jones subsequently dismissed Archbold's application to appeal to the New York Court of Appeals from the Appellate Division's order on the ground that it was precluded by CPL § 450.90(1). (Ex. N).

admitted evidence of uncharged crimes, (c) his arrest was not supported by the probable cause required by the Fourth and Fourteenth Amendments, and (d) he was the victim of prosecutorial misconduct.

II.   Discussion

A.   Timeliness and Mootness

The Respondent concedes that the Petition, which was received by the Pro Se Office of this Court on March 26, 2008, was timely filed. (See ECF No. 1). The Petition also is not moot because a petitioner such as Archbold, despite being on parole, remains "in custody" within the meaning of Section 2254. Harvey v. City of N.Y., 435 F. Supp. 2d 175, 177 (S.D.N.Y. 2006).

B.   Procedural Default

A federal habeas court is precluded from reviewing a claim if the state court's prior denial of it rested on an adequate and independent state ground. See, e.g., Harris v. Reed, 489 U.S. 255, 262 (1989); Wainwright v. Sykes, 433 U.S. 72, 81 (1971). A petitioner's failure to comply with a state procedural rule qualifies as such an adequate and independent state ground, provided that (a) the state court actually "relied on the procedural bar as an independent basis for its disposition of the case," Harris, 489 U.S. at 261-62 (internal quotation marks and citation omitted), and (b) the state procedural rule is "firmly established and regularly followed." See Cotto v. Herbert, 331 F.3d 217, 239-40 (2d Cir. 2003). In determining whether to deny a habeas claim on that basis, federal courts "apply a presumption against finding a state procedural bar and 'ask not what we

19

think the state court actually might have intended but whether the state court plainly stated its intention.'" Galarza v. Keane, 252 F.3d 630, 637 (2d Cir. 2001) (quoting Jones v. Stinson, 229 F.3d 112, 118 (2d Cir. 2000)).  When the last state court to issue a reasoned decision relies on a state procedural bar, however, a court reviewing a habeas petition will presume that subsequent decisions rejecting the claim without discussion relied on the bar and did not silently consider the merits.  Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991).  Furthermore, even if the state court proceeds to consider the merits of the claim, its reliance on a procedural ground as one basis for the denial of the claim precludes habeas review.  Glenn v. Bartlett, 98 F.3d 721, 724 (2d Cir. 1996).

Federal review of a procedurally-defaulted claim is prohibited unless the petitioner can demonstrate "cause for the default and actual prejudice as a result of the alleged violation of federal law, or . . . that failure to consider the claims will result in a fundamental miscarriage of justice." Coleman v. Thompson, 501 U.S. 722, 750 (1991); Glenn, 98 F.3d at 724.  To establish cause for a default, a petitioner must adduce "some objective factor external to the defense" which explains why he did not raise the claim previously.  Murray v. Carrier, 477 U.S. 478, 488 (1986); Gonzalez v. Sullivan, 934 F.2d 419, 422 (2d Cir. 1991).  A showing of prejudice requires a petitioner to demonstrate that the failure to raise the claim previously had a substantial injurious effect on the petitioner's case such that he was denied fundamental fairness.  Reyes v. New York, No. 99 Civ. 3628 (SAS), 1999 WL 1059961, at *2 (S.D.N.Y. Nov. 22, 1999).  Finally, to establish a fundamental miscarriage of justice, a petitioner must demonstrate that he is

"actually innocent." <u>Aparicio v. Artuz</u>, 269 F.3d 78, 90 (2d Cir. 2001). As the Supreme Court has indicated, the "miscarriage of justice exception is concerned with actual as compared to legal innocence." <u>Calderon v. Thompson</u>, 523 U.S. 538, 559 (1998) (quoting <u>Sawyer v. Whitley</u>, 505 U.S. 333, 339 (1992)). A claim of actual innocence therefore must be supported by "new reliable evidence." <u>Schlup v. Delo</u>, 513 U.S. 298, 324 (1995). For this reason, "claims of actual innocence are rarely successful." <u>Id.</u>

      1.    <u>Direct Appeal</u>

      In its decision affirming Archbold's conviction, the Appellate Division determined that several of Archbold's claims were unpreserved. <u>Archbold</u>, 835 N.Y.S.2d at 579. In that regard, although the court addressed Archbold's claim regarding A.B.'s hearsay statements to Drs. McIntosh and Ogunleye, it declined to review "his remaining arguments concerning prompt outcry testimony and other alleged hearsay." <u>Id.</u> The court further found Archbold's repugnant verdict and Fourth Amendment claims to be unpreserved, as well as his "uncharged crimes arguments" insofar as they did not pertain to the prior bad acts discussed at the <u>Molineux</u> hearing. <u>Id.</u> Accordingly, even though the court also noted that these claims were meritless, the fact that they were unpreserved served as an independent basis for their denial. <u>See Glenn</u>, 98 F.3d at 724. The Appellate Division's denial of these claims therefore rested on an "independent" state ground.

      Turning to the issue of adequacy, although the Appellate Division did not identify the procedural rules it relied upon to reject Archbold's unpreserved claims, it is clear from context what they were. First, with respect to Archbold's Fourth Amendment

claim, the Respondent had observed that this claim was unpreserved because Archbold failed to challenge the legality of his arrest through a motion to suppress pursuant to CPL § 710.20.  (Resp't's App. Br. at 56).  CPL § 710.70 expressly provides that a "motion to suppress evidence made pursuant to this article is the exclusive method of challenging the admissibility of evidence . . ., and a defendant who does not make such a motion before or in the course of a criminal action waives his right to judicial determination of any such contention."  CPL § 710.70.  It seems clear that this was the rule the Appellate Division relied upon since New York courts routinely cite it as a basis for denying claims that the police lacked the requisite suspicion to justify an arrest.  See People v Jackson, 888 N.Y.S.2d 657, 658 (3rd Dep't 2009); People v. Lancaster, 708 N.Y.S.2d 182, 183 (3rd Dep't 2000); People v. Jones, 551 N.Y.S.2d 141, 141-42 (4th Dep't 1990).  Archbold's Fourth Amendment claim therefore is procedurally defaulted because CPL § 710.70 is a rule that is "firmly established and regularly followed," and therefore provides an adequate state ground on which to deny Archbold's Fourth Amendment claim.

Turning to Archbold's contention that his conviction for Aggravated Sexual Abuse in the Second Degree and his acquittal on the charge of Rape in the First Degree were inconsistent, the Respondent had argued on appeal that Archbold failed to preserve this claim because he did not raise it until after the jury had been discharged.  (Resp't's App. Br. at 33).  It is well established under New York law that "in jury cases any claim that the verdict is repugnant must be made before the jury is discharged." People v. Alfaro, 66 N.Y.2d 985, 987 (1985).  Again, therefore, the Appellate Division relied on a

22

procedural rule that constituted an adequate ground to justify the denial of Archbold's repugnant verdicts claim.

Finally, with respect to Archbold's unpreserved hearsay arguments, the Respondent had noted that Archbold "excepted to the court's ruling only as it related to Drs. Ogunleye and McIntosh." (Resp't's App. Br. at 48). The Respondent further asserted that, with respect to any evidence of prior bad acts not specifically addressed at the <u>Molineux</u> hearing, Archbold's objections at trial "were unelaborated . . . and/or unconcerned complaints about the manner in which the testimony was elicited." (<u>Id.</u> at 39). Under CPL § 470.05(2), New York's contemporaneous objection rule, a challenge to a court's ruling is preserved "when a protest thereto [is] registered, by the party claiming error, at the time of such ruling or instruction or at any subsequent time when the court had an opportunity of effectively changing the same." CPL § 470.05(2). Moreover, the objection must be specific enough to apprise the court of the party's position with respect to the ruling in question. See <u>id.</u>; <u>Green v. Travis</u>, 414 F.3d 288, 294 (2d Cir. 2005). The Second Circuit has found both requirements of the contemporaneous objection rule to be "adequate under firmly established and regularly followed state law." <u>Garvey v. Duncan</u>, 485 F.3d 709, 720 (2d Cir. 2007). Archbold's unpreserved hearsay and uncharged bad acts claims consequently are procedurally defaulted to the extent the Appellate Division found them procedurally barred.[10]

---

[10]     As set forth below, the fact that the Appellate Division reached the merits of certain of Archbold's claims regarding uncharged crimes and hearsay statements provides cold comfort to Archbold since he never couched these claims in federal constitutional terms. These

2.  <u>Motion to Vacate the Judgment</u>

In his decision denying Archbold's motion to vacate the judgment of conviction, Justice Allen expressly relied on CPL § 440.10(2) as a basis for the denial of several claims.  (Ex. J at 1-2).  That statute provides that a state court must deny a motion to vacate a judgment of conviction in several circumstances, including (i) when an appeal was taken, the record contained "sufficient facts" for the ground or issue to be reviewed, but the defendant failed to do so, and (ii) when the ground or issue "was previously determined on the merits upon an appeal from the judgment."  CPL § 440.10(2)(a), (c). Justice Allen found, for example, that Archbold previously had raised as part of his direct appeal the claim that his trial counsel "was ineffective based on the failure to object to certain issues at trial."  (<u>See</u> Ex. J at 2).

The Second Circuit has held that when an ineffective assistance claim is record-based, CPL § 440.10(2) constitutes a rule that is firmly established and regularly followed.  <u>See</u> <u>Sweet v. Bennett</u>, 353 F.3d 135, 139-40 (2d Cir. 2003).  On the other hand, when an ineffectiveness claim requires development of the record, the failure to assert a claim on direct appeal is not a basis for a habeas court to deny relief because the New York courts recognize the need for collateral proceedings.  <u>Id.</u>; <u>Bonilla v. Portuondo</u>, No. 00 Civ. 2369 (JGK), 2004 WL 350694, at *10 (S.D.N.Y. Feb. 26, 2004) (Report & Rec. of Francis, Mag. J.).  CPL § 440.10(2) consequently is not uniformly applied — and therefore is not an adequate state ground for the denial of relief — when the record needs

claims, too, consequently are unexhausted and procedurally defaulted.  <u>See</u> Section II.C, <u>infra</u>.

to be developed further.  See Pearson v. Greiner, 02 Civ. 10244 (RJH) (GWG), 2004 WL

2453929, at *10 (S.D.N.Y. Nov. 3, 2004).

   The task therefore becomes to determine whether any of the claims that

Justice Allen denied on the basis of CPL § 440.10(2) required further development of the

record.  The first such claim was that the Criminal Court lacked jurisdiction over

Archbold because he previously had been charged in Family Court.  (Ex. J at 1).  This

claim presented strictly a legal question and therefore was not record based.

   Justice Allen also had denied, on the basis of CPL § 440.10(2), Archbold's

claim that he was not present for certain "hearings," stating that Archbold was, in fact,

there.  (Id.).  In the absence of the trial transcript, it is unclear whether Justice Allen's

determination that Archbold was "present" was based on a review of the record or the

Justice's independent recollection.  Given this uncertainty, the Court cannot say, as a

matter of law, that this claim could have been raised on direct appeal.  Archbold therefore

may pursue that claim in this forum.

   Next, Justice Allen relied on Section 440.10(2) to deny Archbold's

ineffectiveness claim based on the alleged lack of "sufficient suppression motion papers,"

explaining that there was no evidence that could have been suppressed.  (Id. at 2).  The

lack of any evidence relating to identification procedures, statements to the police, or

physical evidence seized from Archbold was something that could be ascertained from

the record.  Accordingly, this claim, which could have been raised on direct appeal, is

procedurally defaulted.

Finally, Justice Allen's denial of Archbold's claim that his trial counsel was ineffective because he failed to voice adequate objections was based on the fact that this claim had been raised on appeal and expressly rejected by the Appellate Division. (Id. at 3). This too is an independent and adequate state ground for denial of the claim that bars habeas review. See Esquilin v. Walker, No. CV-91-4608, 1992 WL 151903, at *3 (E.D.N.Y. June 16, 1992) ("Collateral review is barred since the claim was raised on direct appeal to the Appellate Division.").

In sum, based on Justice Allen's decision, Archbold's claims concerning the Criminal Court's jurisdiction, his pretrial counsel's failure to file an adequate suppression motion, and his trial counsel's failure to object are procedurally defaulted. So too are the claims that the Appellate Division found unpreserved. Accordingly, the Court cannot entertain these claims unless Archbold is able to show cause for the default and actual prejudice, or that the failure to consider the claims will result in a fundamental miscarriage of justice. Coleman, 501 U.S. at 750. In his papers, Archbold has not made any of these required showings. These claims consequently cannot be considered.

C.    Exhaustion

In addition to the barriers posed by the procedural default doctrine, Archbold's Petition may not be granted unless he has exhausted all available state court remedies, or there is an absence of state corrective process, or circumstances render that process ineffective to protect his rights. See 28 U.S.C. § 2254(b)(1)(A)-(B). As a defendant charged with crimes in New York State, Archbold unquestionably had an

26

effective process available to him through the existing state statutes governing appeals and collateral challenges in criminal cases.  See CPL §§ 440.10, 450.10.  Therefore, to satisfy the exhaustion requirement with respect to a particular federal claim, Archbold must show that he presented to the highest state court the substance of the same federal constitutional claim that he now seeks to raise in federal court.  Aparicio, 269 F.3d at 89-90.  To meet this requirement, it is not necessary that the federal constitutional claim be presented in haec verba.  Rather, there are a number of ways in which the claim may be presented, including:

> [1] reliance on pertinent federal cases employing constitutional analysis, [2] reliance on state cases employing constitutional analysis in like fact situations, [3] assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution, and [4] allegation of a pattern of facts that is well within the mainstream of constitutional litigation.

Daye, 696 F.2d at 194.

Additionally, a federal court may "deem" an otherwise unexhausted claim exhausted if the state court to which the petitioner would be required to present the claim in order to exhaust it would find the claim procedurally barred.  Coleman, 501 U.S. at 735 n.1; Aparicio, 269 F.3d at 90.  In that circumstance, although the petitioner technically will have satisfied the exhaustion requirement, he also will have procedurally defaulted his claim, thus preventing the federal court from reaching the claim's merits, unless the petitioner can show either cause for the default and resulting prejudice or actual

innocence.  See Sweet, 353 F.3d at 139; Sams v. Donelli, No. 07 Civ. 4600 (DLC), 2008

WL 2939526, at *3 n.2 (S.D.N.Y. July 28, 2008).

      When faced with an unexhausted claim, a federal habeas court may, in

certain circumstances, order a stay to allow the petitioner to exhaust the claim in state

court.  See Rhines v. Weber, 544 U.S. 269, 277 (2005); Zarvela v. Artuz, 254 F.3d 374,

381-82 (2d Cir. 2001).  To stay the petition when the unexhausted claim is "plainly

meritless," however, would be an abuse of discretion.  Rhines, 544 U.S. at 277.  Federal

courts thus have the power to deny an unexhausted claim on the merits.  28 U.S.C.

§ 2254(b)(2).

      The Respondent contends that Archbold failed to exhaust his ineffective

assistance of counsel claim, insofar as it is based on counsel's failure to make certain

objections at trial, because his letters seeking leave to appeal to the Court of Appeals did

not specify that he wanted this claim to be reviewed.  (Resp't's Mem. at 24).  Archbold's

lack of probable cause claim allegedly suffers from the same defect.  (Id.).  The

Respondent further maintains that Archbold failed to exhaust his prosecutorial

misconduct claims based on (a) the prosecutor's introduction of hearsay evidence, (b) his

request that pretrial counsel withdraw his grand jury cross-notice, and (c) his reliance on

perjured testimony in the grand jury.  (Id. at 25).  Specifically, the Respondent argues that

Archbold failed to present his hearsay evidence claim to the Appellate Division in federal

or constitutional terms, and failed to raise the remaining two issues at all on direct appeal

or in his post-conviction motions.  (Id.).  Finally, the Respondent asserts that Archbold's

claim regarding uncharged crimes is unexhausted because Archbold failed to present it in federal or constitutional terms in his Appellate Division brief.  (Id. at 25-26).

As discussed above, Archbold's Fourth Amendment claim, his unpreserved hearsay and uncharged act claims, and his ineffective assistance claim (insofar as it is based on trial counsel's failure to object) are procedurally defaulted.  (See supra, Section II.B).  Accordingly, the Court need not determine whether these claims are unexhausted.  See Sweet, 353 F.3d at 139.

Archbold's claim that the prosecutor engaged in misconduct by relying on perjured testimony in the grand jury is unexhausted because Archbold never presented this claim to any state court.  Because this claim is record-based, the Court must deem it exhausted and, consequently, procedurally defaulted.[11]  Id.  As for Archbold's prosecutorial misconduct claim relating to the withdrawal of his grand jury cross-notice, this claim, too, is unexhausted because it never was presented to a state court.  Although Archbold would not be precluded from returning to state court to exhaust this claim, for the reasons discussed below, (see infra n.12), this claim is plainly meritless and, therefore, should be denied.

Archbold's remaining claims — that the prosecutor improperly introduced A.B.'s hearsay statements to two physicians and that the trial court erred by admitting

---

[11]      As noted previously, CPL § 440.10(2) prohibits a trial court from vacating a judgment when "sufficient facts appear on the record of the proceedings underlying the judgment to have permitted, upon appeal from such judgment, adequate review of the ground or issue raised upon the motion," yet the movant failed either to appeal his conviction or raise the ground on appeal.

evidence of certain uncharged crimes discussed at the <u>Molineux</u> hearing — also are unexhausted because, as the Respondent correctly points out, the Appellate Division never was made aware of the federal nature of these claims.  Indeed, in discussing these claims in his brief, Archbold never mentioned a provision of the United States Constitution or cited a federal case.  (<u>See</u> Pet'r's App. Br. at 6-17).  Since the state courts would decline to hear these claims if they were presented some six years after Archbold's conviction, these claims too must be deemed exhausted and procedurally defaulted.  <u>See</u> CPL 440.10(2).

As noted above, Archbold has not demonstrated either cause and prejudice or actual innocence.  The Court therefore may not review any of Archbold's claims that have been deemed exhausted and therefore procedurally defaulted.

D.    <u>Merits</u>

Having addressed the procedural roadblocks to most of Archbold's claims, I will turn to the merits of the few claims that are reviewable.

1.    <u>Standard of Review</u>

A habeas corpus petition is not a vehicle to relitigate every issue previously determined in state court.  <u>Herrera v. Collins</u>, 506 U.S. 390, 401 (1993).  Instead, a state prisoner seeking habeas relief under Section 2254 must show that he is "in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  The petitioner thus has the burden of proving, by a preponderance of the

evidence, that his rights have been violated.  See Jones v. Vacco, 126 F.3d 408, 415 (2d

Cir. 1997).

        Section 2254, as amended by the Antiterrorism and Effective Death Penalty

Act of 1996 ("AEDPA"), provides, in part, that:

> An application for a writ of habeas corpus on behalf of a
> person in custody pursuant to the judgment of a State court
> shall not be granted with respect to any claim that was
> adjudicated on the merits in State court proceedings unless
> the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an
> unreasonable application of, clearly established federal law,
> as determined by the Supreme Court of the United States.

28 U.S.C. § 2254(d)(1) (emphasis added).

        As the Second Circuit noted in Stinson, the Supreme Court has "construed

the amended statute so as to give independent meaning to 'contrary [to]' and

'unreasonable.'"  229 F.3d at 119.  Under the "contrary to" clause, a federal habeas court

"may grant the writ if the state court arrives at a conclusion opposite to that reached by

[the Supreme] Court on a question of law or if the state court decides a case differently

than [the] Court has on a set of materially indistinguishable facts."  Williams v. Taylor,

529 U.S. 362, 412-13 (2000).  Under the "unreasonable application" clause, a federal

habeas court should "ask whether the state court's application of clearly established

federal law was objectively unreasonable."  Id. at 409.  This standard does not require that

all reasonable jurists would agree that the state court was wrong.  Id. at 409-10.  Rather,

the standard "falls somewhere between 'merely erroneous and unreasonable to all

31

reasonable jurists.'"  Stinson, 229 F.3d at 119 (quoting Francis S. v. Stone, 221 F.3d 100,

109 (2d Cir. 2000)).

Section 2254(d)(2) also authorizes the federal courts to grant a habeas writ

when a claim considered on the merits in state court "resulted in a decision that was based

on an unreasonable determination of the facts in light of the evidence presented in the

State court proceeding."  28 U.S.C. § 2254(d)(2).

Finally, to the extent that a habeas petition challenges factual findings,

Section 2254(e)(1) provides that: "a determination of a factual issue by a State court shall

be presumed to be correct" and "[t]he [petitioner] shall have the burden of rebutting the

presumption of correctness by clear and convincing evidence."  Id. § 2254(e)(1).

"If, after carefully weighing all the reasons for accepting a state court's

judgment, a federal court is convinced that a prisoner's custody . . . violates the

Constitution, that independent judgment should prevail."  Williams, 529 U.S. at 389.

2.      Ineffective Assistance of Counsel

Only two of Archbold's ineffective assistance of counsel claims are

properly before the Court.  Those claims relate to Mr. Spirn's pretrial strategy and

Archbold's contention that he was not present at two "hearings" before the trial court.

(See Pet. ¶ 22(A) & Attach. at 1-4, 17-19).

To prevail on an ineffective assistance of counsel claim, a petitioner must

demonstrate that (a) his counsel's performance "fell below an objective standard of

reasonableness" and (b) there is a "reasonable probability that, but for counsel's

unprofessional errors, the result of the proceeding would have been different."  Strickland

v. Washington, 466 U.S. 668, 688-694 (1984).  Under Strickland, there is a "strong

presumption that [a lawyer's] conduct falls within the wide range of reasonable

professional assistance."  466 U.S. at 689.  Therefore, Archbold "must overcome the

presumption that, under the circumstances, the challenged action 'might be considered

sound trial strategy.'"  Id. (quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955)).  As the

Second Circuit has noted, "[t]he Strickland standard is rigorous, and the great majority of

habeas petitions that allege constitutionally ineffective counsel founder on that standard."

Lindstadt v. Keane, 239 F.3d 191, 199 (2d Cir. 2001).

a.      Mr. Spirn's Pretrial Strategy

Archbold contends that Mr. Spirn deprived him of the effective assistance

of counsel by withdrawing a grand jury notice indicating his desire to testify, without his

consent or knowledge, "at the request of the Assistant District Attorney."  (Pet. Attach. at

2-3).  In particular, he alleges that, because the case before the grand jury was essentially

a one-witness case without any physical evidence, "there is a reasonable probability that

he would not have been indicted" had he testified.  (Id. at 4).

At the outset, it bears mention that the Fifth Amendment right to a grand

jury proceeding does not apply to the states.  See Alexander v. Louisiana, 405 U.S. 625,

633 (1972).  Consequently, errors alleged to have occurred at the grand jury stage

typically are not reviewable by federal habeas courts.[12]  Id.; Dixon v. McGinnis, 492 F.

Supp. 2d 343, 347 (S.D.N.Y. 2007).  Here, however, Archbold couches his claim as an

ineffective assistance of counsel claim.  As noted above, that claim is properly before the

Court.

In opposing Archbold's motion to vacate the judgment of conviction in

state court, the District Attorney cited a letter, dated March 31, 2006, that Mr. Spirn sent

to a grievance committee in response to a complaint by Archbold concerning the fees he

was charged.  (See Ex. H (Mem. of L.) at 21 (citing Ex. T)).  In that letter, Mr. Spirn

explained that his strategy had been to negotiate the best possible plea bargain, an

opportunity that he believed would likely have been lost had A.B. and Kenneth III been

required to testify before the grand jury.  (Ex. T at 2-3).  Indeed, Mr. Spirn apparently was

able to negotiate two potential plea agreements, both of which would have resulted in a

sentence more lenient than the one that Justice Allen imposed after Archbold opted to go

to trial.  (See Ex. H (Mem. of L.) at 21).

Based on this evidence, in his decision denying Archbold's Section 440.10

motion, Justice Allen concluded that Mr. Spirn's decisions to withdraw his grand jury

cross-notice, request several adjournments, and arrange for Archbold to meet with the

---

[12]     For this reason, to the extent that Archbold accuses the prosecutor of engaging in misconduct by requesting that Mr. Spirn withdraw Archbold's grand jury cross-notice, his claim is not cognizable on habeas review.  See Carpenter v. Conway, No. 07 Civ 3602, 2011 WL 795860, at *9 (E.D.N.Y. Feb. 25, 2011).  In any event, the claim is meritless since "it is well settled that any possible defect in the grand-jury proceeding is cured by a subsequent conviction."  Moreau v. Ercole, No. 08 Civ. 1545, 2011 WL 1741824, at *6 (E.D.N.Y. May 5, 2011) (collecting cases).

prosecutor pursuant to a "queen for a day" agreement was a "reasonable strategy."  (Ex. J at 3).  Indeed, the Justice noted that the prosecutor had what "appeared to be an overwhelming case at least with respect to the Assault in the Second Degree charge." (Id.).

In his papers, Archbold has not shown that Justice Allen's rejection of Archbold's ineffectiveness claim was unreasonable under Strickland.  Nor has he set forth any facts sufficient to overcome the "strong presumption" that Mr. Spirn's strategy was sound.  See Strickland, 466 U.S. at 689.  There consequently is no basis for Archbold's claim that Mr. Spirn provided ineffective assistance by seeking a favorable disposition, rather than focusing his initial attention on securing a prompt grand jury presentation, at which Archbold could testify.  See Williams v. Ricks, No. 02 Civ. 2131 (RCC) (RLE), 2004 WL 1886028, at *7 (S.D.N.Y. Aug. 24, 2004) ("Federal and state courts in New York have consistently held that counsel's failure to effectuate a defendant's right to appear before the grand jury does not establish ineffective assistance of counsel.").

### b.    Archbold's Alleged Non-Presence at Hearings

Archbold also contends that he was not present during the Sandoval and Molineux hearings before Justice Allen, a shortcoming that he views as ineffective assistance on Mr. Marshall's part.  (See Ex. I (Aff. in Supp. & Mem. of L.) at 9).  Justice Allen expressly found, however, that Archbold "was present for these 'hearings', which consisted solely of oral argument."  (Ex. J at 1).  This factual finding must be presumed to be correct.  28 U.S.C. 2254(e)(1).  Archbold consequently has the burden of rebutting the

presumption of correctness by "clear and convincing evidence." Id.  Here, Archbold has

made no such showing.  This aspect of his ineffectiveness claim consequently does not

entitled him to habeas relief.

V.      Conclusion

        Archbold's petition should be denied because he has failed to show that his

conviction was secured in violation of the United States Constitution or federal law.

Additionally, because Archbold has failed to make a substantial showing of the denial of

a constitutional right, he should be denied a certificate of appealability.  See 28 U.S.C.

§ 2253(c)(2).

VI.     Notice of Procedure for Filing of Objections to this Report and Recommendation

        The parties shall have fourteen days from the service of this Report and

Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule

72(b) of the Federal Rules of Civil Procedure.  See also Fed. R. Civ. P. 6(a) and (d).  Any

such objections shall be filed with the Clerk of the Court, with courtesy copies delivered

to the chambers of the Honorable Sidney H. Stein and to my chambers at the United

States Courthouse, 500 Pearl Street, New York, New York 10007, and to any opposing

parties.  See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b).  Any requests for an

extension of time for filing objections must be directed to Judge Stein.  The failure to file

these timely objections will result in a waiver of those objections for purposes of appeal.

See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b); Thomas v. Arn, 474 U.S. 140

(1985); Frank v. Johnson, 968 F.2d 298, 300 (2d Cir. 1992).

Dated:     New York, New York
           June 20, 2011

                                        FRANK MAAS
                                        United States Magistrate Judge

Copies to:

Kenneth Archbold
400 East 30th Street
New York, New York 10016

Leilani Rodriguez, Esq.
Assistant Attorney General
120 Broadway
New York, New York 10271